May it please the Court, my name is Manuel Rios. I represent the petitioner Ms. Gamarra. I'd like to reserve two minutes for rebuttal. This is a consolidated appeal of the BIE's denial of the petitioner's asylum and withholding claims and a denial of a motion to reopen. There are three issues in this appeal. The first one is, is Ms. Gamarra's fear reasonable? The second one is, is that fear on account of any of the protected characteristics underneath the act? And the third one was the BIE's denial of the motion to reopen contrary to law and arbitrary. In regard to the first issue, the immigration judge's decision as to finding Ms. Gamarra's fear not objectively reasonable is not supported by the substantial evidence in the record. The decisionmaker can only be affirmed on the grounds found in the decision. And in this particular case, the immigration judge enumerated three separate reasons for finding Ms. Gamarra's fears not to be reasonable. And the first two, the modest amount of evidence allegedly given by her husband, who's the informant in this case, and the fact that the person informed upon is a fugitive, they're simply facially not borne out by the record. I'm not going to discuss them unless the Court wants to hear more about that. As far as the third reason, the fact that Ms. Gamarra and her husband both have family members that remain in Colombia, I would first state that the immigration judge didn't use the correct standard. The correct standard is that generally an asylum claim is not undercut unless there's family in the home country that are similarly situated to the applicant. The immigration judge didn't mention the phrase similarly situated in any part of his decision. Nevertheless, the family members that remain in Colombia are not similarly situated to the petitioner nor her husband. The record shows that Ms. Gamarra has her mother and her brother that remain in Colombia. There is no evidence in the record that showed that mother and brother have any kind of connection to the informant in this case who's Ms. Gamarra's husband. So they're not married to an informant. There's no evidence that they know anything about this or they participate in any of this informant activity. Furthermore, on the other side, Mr. Induburo's family is similarly not situated as the applicant, the petitioner in this case, because they're related by blood to the drug trafficker. So Ms. Gamarra is related to Mr. Induburo, who is related to the drug trafficker. Mr. Induburo's family is also related to the drug trafficker. Ms. Gamarra is not. So, therefore, the family members are not similarly situated. And, you know, the Supreme Court has quantified the reasonableness aspect of an asylum claim as a 1 in 10 chance in Cardozo-Penseca. And this court later on in Canales said this is a very low standard. And, in fact, it is a low standard. And recently this court assessed a similar situation in Ochoa, in Colombia, where the court found that there is no question as to whether or not the applicants in that case would be harmed and possibly killed for their failure to acquiesce to the drug traffickers' demands. The issue in Ochoa was whether or not there was a nexus to the act. That's the next issue here. But the factual finding there that there's no issue as to whether or not they'll be harmed and killed on account of failure to simply acquiesce. Here we have an affirmative act against the drug trafficking organizations. If you put Briones in together with Ochoa, you have the court held in Briones. If failure to acquiesce to the NPA's demands results in death, it takes little imagination to see what an overt act would result in. So here we have almost assuredly the facts borne out that if the drug traffickers find out that Ms. Gamarra's husband is an informant, effectively she's dead. And that's the factual findings that this court has made in regard to Columbia. The immigration judge's reasoning is not substantiated by substantial evidence. The second case is an interesting issue. The Ninth Circuit case law mandates a finding of a nexus to the act by simply aligning oneself with a government employer. The court has used many different phrases to deal with this, presumed the presumption of being aligned with somebody that the employer, especially if it's a government actor, is imputed onto the person who's aligned with them. There's a plethora of case law that supports this, most importantly, according to Garcia, Aguilera-Cota, and Segadec, which the court stated in Judge Piazza's case that status as a government employee clearly suffices to show an imputed political opinion under our case law. Counsel, there are some assertions in this case that the reason she got the threats when she was down in Columbia were because family members were jealous of her being the person who got the inheritance from the father. How do you respond to that? Well, certainly, Your Honor, that was one part. In the underlying case, there was a kind of two-pronged attack. The first one is that she feared the FARC, and that was based on the inheritance and her half-brothers being dissatisfied with being left out of the will. And really, we're not bringing any of that part up to this. We haven't brought that part in. What we're concentrating now is simply the evidence and the record. And this court has found that you can use circumstantial evidence. What we have here is the record alone, the fact that the DEA letter, excuse me, that corroborates that Mr. Induboro was indeed an informant for over a year with them and the background country conditions that show that the price of informing is death in Columbia and most likely the drug traffickers know that he's an informant due to their immense wealth and their network of informants and their counterintelligence agencies. That compels a finding, especially when you look at the case law here, such as Brioni's and Lim, which specifically deal with a government informer. And specifically, the court was saying— Am I correct, counsel? Counsel, am I correct that there is one threat that relates to the cartel, supposedly relates to the cartel? Is that correct? There is one threat. That is correct, Your Honor. But even in the absence of that one threat, our position is it is inherently reasonable, based on the court's findings and the factual evidence in the record, to fear harm, at least a 1 in 10 percent chance of harm on account of this political opinion that's imputed to her because the drug traffickers will find out. So, Brioni's and Lim specifically stated— it rejected the same kind of theory that the BIA and IJ used in this case, that this is simply a retaliation, a vendetta, it's personal. In Brioni's and Lim, which have dealt with government informers, it said retaliation versus an informer is indeed on account of an imputed political opinion. And furthermore, this court has recognized an en banc case in Borja that, you know, the persecutors can have mixed motives. And so, as long as the evidence shows that it was at least in part on account of— so we have a line of cases that ask for something plus. So we have—what we have here is the plus. We have the presumed affiliation. In Aguilera-Cota, Corden-Garcia, the presumed support just by virtue of working for the government. In Corden-Garcia, the presumed affiliation in the obvious inference. That's how the Court described these things. And that's basically where we're at. I'd like to reserve the rest of my time for rebuttal.  Thank you. Thank you. Good morning, Your Honors. May it please the Court. I represent the Respondent. My name is Paul Stone. This is an asylum case where one of the core issues is whether the Petitioner, Ms. Scamara, has a reasonable fear of persecution on account of a political opinion imputed to her by the Cali cartel. For reversal, this requires the evidence to compel the conclusion that her husband  impute that political opinion to her. The evidence must also compel the conclusion that her husband's close family living in Colombia without being harmed does not undermine her fear of persecution. Let me ask. It's clear in the record that the husband did work for the DEA for a period of time. Is that correct? That's correct, Your Honor. Okay. So that's not in dispute. That's right. It's also clear that there was no question about credibility in this case. Is that right? That's correct, Your Honor. The immigration judge accepted her testimony as credible. And I believe the husband testified by telephone, too, as well? Yes, he did. Is that correct? But his testimony was primarily through his declaration. But he did also testify through telephone to reaffirm his declaration. So, you know, if you put this all in context in Colombia, and all the background material that's in the record regarding how the narco industry in Colombia is basically, you know, is infiltrated or in cahoots or whatever you want to call it with the government, why isn't there? Why doesn't the record in this case compel a finding that there's a 1 in 10 chance percent that, you know, if she gets sent back there, you know, the outcome is pretty great. Assuming that's the outcome, Your Honor, which it isn't necessarily, but the question is whether that persecution would be on account of an imputed political opinion that the cartel would impute to her from her husband. And the record doesn't show that there's any such political opinion here. In fact, her husband admitted in his application that the – in his declaration that the reason he informed for the DEA was he was hoping to get legal status in the United States. Now, that – for Kat, you don't need to have any imputed political opinion, and opposing counsel says that she'd be killed. That's correct, Your Honor. The political opinion doesn't matter for Kat. It's solely whether or not that she actually has a greater than 50 percent likelihood of being tortured. Death is torture, don't you? Torture is the minimum standard. Death is what she says will happen. Yeah. And I think the record bears up that if she and the cartel did in fact know that he was an informer and did in fact want to retaliate against him, that would be the likely outcome. Why isn't it – I don't understand why – can you explain to me why it's not political? In the context of Columbia. Well, the – The record and the testimony, I think the one DEA agent who testified before me is really interesting. Yes, Your Honor. About the politics. And I'm not contesting that. Oh, the narco-democracy or narcoc – narcoc? Narco-democracy. Yeah, narco-democracy or something. Yeah, I don't think that's – There's a word for it that he uses that I thought was interesting. I mean, why isn't it political? The reason is, Your Honor, is the organization is – it does in fact have some political attributes in that. It does get heavily involved in the government. But it is primarily a criminal business enterprise, and the primary goal is to make a profit. And they infiltrate the government and become involved in that for that primary purpose. If, for example, her husband had been going after the corruption within the government, the political aspects of the Culley cartel, then it would appear to be a political opinion or at least have one imputed to him. But here, he's going against their financial interests. Well, but the United States government – it's clear from the record that the United States government works closely with the Colombian government to, you know, to put a stop to the drug trafficking trade that goes on down there. And anybody that's affiliated, I gather, with – is working with either the Colombian government or with the United States government in pursuit of this effort, it's viewed as political. Why isn't it viewed – why isn't that political? I don't understand. I don't think the Culley – I mean, the record doesn't compel a conclusion that the Culley cartel particularly cares about the political view of people who inform against them. It doesn't ascribe to them a particular view. What it ascribes to them is that they – these people are harming them, they're against them, and against their criminal business interests. And that is, at the most, the view that would be compelled by the record here. She hasn't presented any testimony or anything – or any evidence that the cartel does regard people against it as having political opposition to them. If you look at the Ninth Circuit cases where being – working for the government has been found to impute a political opinion, those cases typically are against communist guerrillas such as Sindrome Menoso, the guerrillas in El Salvador, and other countries. Organizations whose primary purpose it is to overthrow the government, to instill what they believe is the proper form of government, you know, Maoist or communist government. You know, I wonder about the policies of our government. We get this guy to work for the DEA, and now we're going to toss him back to take the consequences in Colombia. I would think there would be a strong incentive on the part of the government to want to have people work for the DEA, and this is certainly a disincentive. And I'd like you to carry that message back to your government. I think that is a valid concern, Your Honor. The problem here is we don't really know what happened in the situation. All we have is the letter from the DEA. We don't know what other efforts her husband went through to get evidence of what exactly he told the DEA or what the agreement was between them. The DEA shouldn't be required to give everyone who comes to them automatic permanent residence status. Well, but short of that, should you deport people who work for the DEA? That's a separate issue. Right. Yes, Your Honor. The issue is here, if you did go to the DEA saying I'd like to give you some information in return for legal status, we don't know what happened. I suspect the DEA said that's fine if you give us something that allows us to break up a portion of the cartel, arrest someone, put someone in jail, do something of that sort. We don't know if that's what happened. We don't know if he actually brought anything back that really accomplished anything for the DEA. The letter suggests that he didn't provide much information that was very helpful. It would eliminate the... Well, your suggestion is that this conduct doesn't really qualify because it's more of an organized crime as opposed to political guerrilla. But in a situation where the narcotraficantes are essentially both in cahoots and in juxtaposition against the government, what's your best case for your position that that isn't, you can't impute some kind of political view from this very odd relationship we have in Colombia? Well, Your Honor, there was a decision of this court in Ochoa v. Gonzales. In that case, the court found that the record didn't compel the conclusion that it was an imputable public opinion where an individual had become indebted to the narcotraffickers and refused to pay them. And he fled for the United States. And they said essentially that the court said that that was against the cartel's financial interests, but there's no political basis there. And here similarly... But isn't it a little bit different when you have two governments joined to the party, which is both the Colombian government and the U.S. government? And it's not just a question of a drug deal gone bad or the Ochoa situation, but you basically have him working for the U.S. government, which in turn is cooperating with the Colombian government to try to eradicate this group. Doesn't that bring the government and the political imprimatur to the table? As far as the United States' relationship with Colombia, that's certainly political. Its pursuit of the cartel itself is Garden Friday law enforcement. Well, it's a little more than that because it's done overseas. But it doesn't necessarily mean that they're going to then impute to her husband this political opinion. I think we do also need to discuss the next step, which is are they going to then impute, assuming he has a political opinion, will they then impute that opinion to his wife? And we have absolutely no evidence in the record here that that would be the case. In fact, she did testify that the reason they would go after her if they did, if they did find out he was an informant, would be to force him to give them information as to what he told the government. But we have the threat. There's the threat in the record. That's right. You take his credible. There's a warning from. Warning. There's a pretty strong warning. There's a pretty, pretty. Well, it was. You better be careful. I don't want to quote it, but it was a warning. You better watch it. Your Honor, she did take it as very strong. She immediately came to the United States. She returned to the United States a month later, yes. The issue with that warning, though, is it was very vague. He didn't say why he was warning her. She just supposed that because he was friends with the husband and did have connections with the cartel, that it was because of that. But she also testified that the reason he didn't give any more information in the warning is because he didn't want her to fear for her life, which is a little strange, given that that's how she took the warning. But even so, the warning itself doesn't establish that they have then imputed a political opinion to her. According to her testimony, I'm sorry, Your Honor. I seem to have run out of time here. Let me just make sure. Judge McKeon, does have any further questions? I'm fine. Thank you. Okay. Thank you. All right.   It's time. I think that this court's decision at Segedik v. Gonzales is pretty close to what we have here. Segedik v. Gonzales deals with a Ukrainian tax collector who went after a company and has overtones of organized crime there that they weren't paying their taxes, something like that. And this Court found that the persecution of people who work for political figures, and in this case it was politically charged to be on account of political opinion, imputed political opinion. And as I was stating before, the Court framed it in various ways, presumed support, presumed affiliation. In Lim, the Court described it as some kind of revenge or retaliation plus. What do we have here that's the plus? We've got the employment as a government, with the government. So that's the plus. We've got the presumed affiliation, the obvious inference, the presumed support that this Court has consistently found to constitute political opinion. It is, indeed, ironic that if we were to send Mr. Ingeroll back after working with this, working with the DEA. In fact, the Court in L. Harvey also recognized the cruel irony of that. We would respectfully request that the Court find that Ms. Gamarra has a reasonable fear that it is based on a nexus to the Act, and return this case for a finding for the exercise of discretion to the agency. Alternatively, we'd ask that if the Court found there was no nexus to the Act, this case be returned for proper consideration of the expert's affidavit as the BIA discounted it for unlawful and arbitrary reasons. Thank you. Thank you. Thank you for your arguments. The matter will be submitted, and we'll hear argument in our next case.
judges: B. Fletcher, McKeown, Paez